FILED'09 SEP 28 12:35usdc-orp

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

WILLIAM N. MILLER,

                                        Civil No. 07-1066-BR

            Petitioner,

                                        OPINION AND ORDER

      v.

JEAN HILL,

            Respondent.

**TODD H. GROVER**
143 SW Shevlin-Hixon Dr.
Suite 203
Bend, OR  97702

      Attorney for Petitioner

**JOHN R. KROGER**
Attorney General
**JONATHAN W. DIEHL**
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

      Attorneys for Respondent


1 - OPINION AND ORDER -

**BROWN, Judge.**

Petitioner brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Currently before the Court are Petitioner's Motion for Leave to File Amended Petition (#38) and Petitioner's Motion for Leave to Conduct Discovery (#43). For the reasons that follow, the Court **DENIES IN PART** and **GRANTS IN PART** the motion to amend, and **DENIES** the discovery motion.

**BACKGROUND**

**I.  Summary of Facts**

In May 2000, Petitioner and his wife moved to Corvallis, Oregon, where they were the primary custodians of two of their grandchildren, Jeffrey Miller, age 11, and S. Miller ("S.M."), age 6. The children's mother, Brenda Miller who is Petitioner's step-daughter, moved to Corvallis at the same time, but she was unable to care for the children herself and lived at a separate residence.

In August 2000, Corvallis Police received a complaint concerning Jeffrey Miller. The report indicated Jeffrey had kissed another girl in the neighborhood, and that he had also touched her chest and exposed himself to her. A Corvallis police officer and an employee of the Oregon Department of Human Resources, Division for Services to Children and Families ("SCF") (collectively, "the investigators") looked into the complaint.

Their initial investigation revealed that Jeffrey had also attempted to push the girl's face into the front of his pants, apparently simulating oral sex.

On August 25, 2000, the investigators attempted to contact Jeffrey at the residence of Petitioner and his wife. The investigators spoke to Petitioner and his wife separately. Both said Jeffrey was out of town, but they gave differing explanations for where and with whom he had gone.

The investigators noted the discrepancies in the Millers' statements about Jeffrey's whereabouts and decided to check Brenda Miller's residence, where they found Jeffrey and S.M. It appeared to the investigators that both children were neglected, developmentally delayed, and generally failing to thrive. The investigators took the children into protective custody and subsequently arrested Petitioner and his wife for interfering with police.

S.M. was placed in foster care. The first night of her placement, her foster parents saw blood in the toilet after she used the restroom, prompting them to take her to the hospital emergency room for an examination. The examination was inconclusive. This, combined with Jeffrey's sexualized behavior and the Millers' deceit, led the investigators to be concerned

3 - OPINION AND ORDER -

whether S.M. had been sexually abused.  They referred S.M. to the ABC House in Albany, Oregon, for a sex abuse evaluation.[1]

On September 11, 2000, S.M. was returned to the Millers' custody.  The SCF investigator testified Petitioner was not then a suspect, and the primary concern was that Jeffrey had sexually abused S.M.  As a result, Jeffrey was not allowed to return to Petitioner's custody and instead was placed in a shelter and evaluation program.

On September 15, 2000, the Millers drove S.M. to the ABC House for her scheduled evaluation.  Once there, the SCF investigator conducted a videotaped, clinical interview of S.M. The investigator testified that S.M. "made no disclosure of sexual abuse" during the interview.  When asked if she had been touched on her "private parts," S.M. answered, "no."  Despite S.M.'s refusal to disclose any sexual abuse in the interview, the evaluator remained concerned because S.M. appeared uncomfortable during discussion of difficult subject matters, covering her mouth and closing her body posture.  When asked at the end of the interview who was the person who was closest to her, S.M. responded, "[h]er grandfather."

---

[1]The ABC house is the child-victim assessment center for Linn and Benton Counties.  Children are referred to the ABC House for evaluation when there is a concern of maltreatment, abuse, or neglect.

While S.M. was at the ABC House, Drs. Sudha Chandrasekhar and Carol Chervenak performed a comprehensive physical examination, including an ano-genital examination. During the examination, the doctors observed the sides of S.M.'s hymen to be abnormally narrow -- less than one millimeter in width. They also observed a deep, V-shaped notch in S.M.'s hymen at the seven o'clock position. According to Dr. Chervenak, the apex or point of this notch reached to within one-half of a millimeter of the vaginal wall. Using a colposcope and 35-millimeter camera, Dr. Chervenak took photographs of the reportedly abnormal hymen. The photographs were not, however, provided to the prosecution or the defense and were not introduced at trial.

Based on their observations, the doctors concluded S.M. had likely suffered a blunt penetrating injury to the hymen, forceful enough to cause a tear which later healed and resulted in the rounded edges of the V-shaped notch. The doctors shared this conclusion with the investigators.

Following the ABC House examination, the investigators discussed the results with Petitioner and his wife. Both expressed anger at the perpetrator, who they suspected might be a son-in-law. When asked whether they would each take a polygraph examination in order to eliminate themselves as suspects, both Petitioner and his wife agreed to do so.

On or about September 20, 2000, Petitioner appeared voluntarily at the Corvallis Police Department for his scheduled polygraph examination which was conducted by a Linn County Sheriff's Detective. During the pre-examination interview and the examination itself, Petitioner denied having any sexual contact with S.M. The polygraph results were reported to be inconclusive, and the Detective later stated that she believed Petitioner purposefully sabotaged the examination.

During this period, the investigators began to develop concerns regarding Petitioner. They heard from other family members that Petitioner had a history of sexually abusing his daughters and step-daughter. Information came to light that Petitioner might be the biological father of Jeffrey, as well as Petitioner's daughter's two teenage sons.[2] Additionally, on September 25, 2000, Jeffrey reportedly disclosed to a counselor that Petitioner had touched his penis and anus in a sexual manner.

On October 13, 2000, Petitioner's wife appeared at the Corvallis Police Department for her scheduled polygraph examination. When Petitioner stopped by the Department to pick up his wife, detectives stopped him and escorted him to an interview room for questioning.

_____

[2] Later DNA testing suggested Petitioner is, in fact, Jeffrey Miller's father. There is no evidence to confirm he is also the father of his daughter's two children.

The investigators read Petitioner his *Miranda* rights and he signed a form setting forth those rights and acknowledging his understanding thereof. Petitioner initially denied any sexual contact with either Jeffrey or S.M., and he maintained his innocence over a one and one-half hour period of questioning. Eventually, however, Petitioner admitted that he penetrated S.M.'s vagina with his finger while bathing her on at least three occasions. Petitioner initially stated this occurred in the communal shower room of the trailer park where they lived, but later he changed his story and said it occurred in the bath inside their trailer. Upon obtaining these admissions, the detectives produced a tape recorder and Petitioner provided a ten-minute, tape-recorded statement confirming his confession. Petitioner was then arrested.

## II.  **Procedural History**

A Benton County grand jury indicted Petitioner on three counts of Sexual Abuse in the First Degree and three counts of Unlawful Sexual Penetration in the First Degree. The charges all related to Petitioner's admission to having penetrated S.M.'s vagina with his finger on three separate occasions.

Prior to trial, Petitioner moved to suppress the confession, arguing it was the product of coercion or inappropriate police tactics. At a hearing on the motion, he testified that he never

7 - OPINION AND ORDER -

penetrated S.M.'s vagina with his finger and explained his statements to the contrary as follows:

> I figured that if I -- they would send -- my grandson had done some of this stuff, and I thought they would leave my family alone if I took the blame for it.

The court denied Petitioner's motion to suppress the confession.

Petitioner waived his right to a jury and the case was tried to the same judge who heard Petitioner's motion to suppress. The prosecution's case relied upon Petitioner's confession and the results of S.M.'s physical examination at ABC House. The prosecution introduced the videotaped interview of S.M. at ABC House during which she denied any abuse had occurred, but the state did not call S.M. as a witness. With respect to S.M.'s denial of abuse in the videotaped interview, the prosecution elicited testimony from the SCF investigator to the effect that children often do not disclose abuse because they are afraid of the perpetrator, afraid of consequences within the family, or because they feel responsibility and guilt.

At the close of the state's case, Petitioner's trial attorney moved for a judgment of acquittal on all counts. He argued the state did not present sufficient corroborating evidence to support a conviction based upon Petitioner's confession. The trial judge denied the motion.

During the defense case, Petitioner's wife testified he never bathed S.M. She also testified about two prior incidents in which

8 - OPINION AND ORDER -

S.M. may have accidentally injured her hymen.  Petitioner did not testify.

The trial judge found Petitioner guilty of each of the charged offenses and sentenced Petitioner to a total of 400 months in prison.

Petitioner directly appealed, arguing the trial court erred in denying his motion for judgment of acquittal.  Petitioner again argued the state failed to present sufficient corroborating evidence as required by Oregon law to support a conviction based upon Petitioner's confession.  The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  *State v. Miller*, 190 Or. App. 305, 79 P.3d 418 (2003), *rev. denied*, 336 Or. 534, 88 P.3d 280 (2004).

Petitioner then sought state post-conviction relief ("PCR"), alleging several claims of ineffective assistance of counsel. Following an evidentiary hearing, the PCR trial judge denied relief.  On appeal, Petitioner raised one issue -- that the PCR trial judge erred in denying Petitioner's claim that trial counsel was ineffective in not objecting to an upward durational departure sentence on Count 6.  The Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  *Miller v. Hill*, 209 Or. App. 816, 149 P.3d 347 (2006), *rev. denied*, 342 Or. 503, 155 P.3d 874 (2007).

9 - OPINION AND ORDER -

On July 23, 2007, Petitioner filed his habeas corpus Petition in this Court. In his original, *pro se* Petition, he alleged four claims of ineffective assistance of counsel:

**Ground One:** Petitioner was denied the effective assistance of counsel in violation of the 6th Amendment of the United States Constitution, made applicable to the states by the 14th Amendment in that trial counsel:

   a.   Failed to object to an upward dispositional departure;

   b.   Failed to object that the judge presiding at petitioner's trial did not take the appropriate oath and therefore was not qualified to preside over the matter at hand;

   c.   Failed to object to evidence relating to reasons an alleged victim may not disclose sexual abuse;

   d.   Failed to object to the imposition of consecutive sentences.

This Court appointed counsel to represent Petitioner. Petitioner now seeks leave to file an Amended Petition for Writ of Habeas Corpus alleging two grounds for relief:

**Ground One:** [Petitioner] was denied his right to the effective assistance of trial counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, when trial counsel failed to object to the imposition of a durational departure sentence pursuant to *Apprendi v. New Jersey*.

**Ground Two:** [Petitioner] is actually innocent of the crimes of conviction. As such, his continued imprisonment violates the Fourteenth Amendment due process guarantee and the Eighth Amendment prohibition against cruel and unusual punishment.

10 - OPINION AND ORDER -

Petitioner also seeks leave to conduct discovery.  He seeks the Court's permission to depose the victim and to issue subpoenas to ABC House, the Oregon Department of Human Services, Linn County Mental Health, and Benton County Mental Health to obtain written reports, photographs, and electronic recordings related to examinations and interviews of the victim and her brother.

Respondent objects to both motions.  With respect to the Motion for Leave to Amend, Respondent argues Ground Two should not be allowed because (1) free-standing, actual innocence claims have not been recognized in non-capital cases; (2) the proposed amendment is untimely; and (3) leave to amend should be denied because of futility.[3]  As to the discovery motion, Respondent contends Petitioner has not shown good cause.

## DISCUSSION

### I.   Motion for Leave to Amend

An application for a writ of habeas corpus "may be amended or supplemented as provided in the rules of civil procedure applicable to civil actions."  28 U.S.C. § 2242.  Under Fed. R. Civ. P. 15(a), a habeas petitioner may amend his pleadings once as a matter of course before a responsive pleading is served and may

---

[3]Respondent does not object to Petitioner's motion to amend Ground One of Petitioner's proposed amended petition.  As such, the Court GRANTS that portion of Petitioner's motion.

seek leave of court to amend his pleading at any time during the proceeding. *Mayle v. Felix*, 545 U.S. 644, 654 (2005).

The grant or denial of leave to amend rests in the sound discretion of the trial court, and will be reversed only for abuse of discretion. *Swanson v. United States Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996). Pursuant to Rule 15, "the court should freely give leave when justice so requires." However, it may be denied if the proposed amendment is futile or would be subject to dismissal. *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991); *see also Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004) (finding that district court did not abuse its discretion when it denied petitioner's request to amend habeas petition to include a tenuous claim). For the reasons set forth below, the Court finds amendment to include a freestanding actual innocence claim under *Herrera v. Collins*, 506 U.S. 390 (1993) would be futile.[4]

In *Herrera*, the petitioner argued that the Constitution prohibits the execution of a person who is innocent of the crime for which he was convicted. The Supreme Court assumed, for the

---

[4]For the purposes of this case, the Court assumes without deciding that a free-standing claim of actual innocence may be asserted in a non-capital habeas case and that actual innocence may provide a basis for equitable tolling of the statute of limitations. *See Hussey v. Blacketter*, 2008 WL 2169528 (D. Or. 2008) (assuming for the purposes of deciding a motion for leave to amend that a freestanding actual innocence claim exists and that it may excuse an untimely petition under 28 U.S.C. § 2244(d)(1)).

sake of argument, that, "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417.

The Supreme Court has not addressed whether a "freestanding" actual innocence claim for habeas relief would apply in a non-capital case. *Herrera*, 506 U.S. at 405; *see also House v. Bell*, 547 U.S. 518, 554-55 (2006) (specifically declining to resolve issue of whether freestanding innocence claims are cognizable under the Federal Constitution).    Nonetheless, the Supreme Court has held that a truly persuasive showing of innocence allows a federal court to disregard an otherwise valid procedural bar and to hear *other* defaulted constitutional claims on their merits. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995) (announcing the rule). The Ninth Circuit has assumed that a "freestanding" actual innocence claim is possible, at least in a capital case. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).

Assuming such a claim is possible, a petitioner must make an 'extraordinarily high' showing. *Carriger*, 132 F.3d at 476. At a minimum, "'a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Osborne v.*

13 - OPINION AND ORDER -

*District Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118
1130-31 (9th Cir. 2008) (quoting *Carriger*, 132 F.3d at 476), *rev'd
on other grnds*, 129 S.Ct. 2308 (2009). "In light of the
presumption of guilt that attaches after a constitutionally valid
conviction, 'it is fair to place on [a petitioner asserting a
*Herrera* claim] the burden of proving his innocence, not just
raising doubt about his guilt.'" *Carriger*, 132 F.3d at 477
(citing *Herrera*, 506 U.S. at 433 (Blackmun, J., dissenting)).
Even if a petitioner seeks only to open the procedural gateway to
other defaulted claims under *Schlup*, he must come forward with
"new reliable evidence -- whether it be exculpatory scientific
evidence, trustworthy eyewitness accounts, or critical physical
evidence -- that was not presented at trial" in order to establish
that "it is more likely than not that no reasonable juror would
have found petitioner guilty beyond a reasonable doubt." *Schlup*,
513 U.S. at 324, 327.

In support of his Motion to Amend, Petitioner offers an
affidavit from Brenda Miller, who, as noted, is the biological
mother of S.M. and the Petitioner's step-daughter. Brenda Miller
states that the victim told her that Petitioner did not sexually
abuse her. In support of his Motion for Leave to Conduct
Discovery, Petitioner offers his own affidavit denying the abuse
ever occurred and explaining his reason for confessing as follows:

It is true that, prior to trial, I told police that I had penetrated SM's vagina with my finger. But that was a lie.   The police first contacted my wife and I in reference to an allegation involving SM's brother, JM. Apparently, JM was acting-out sexually with one or more young girls in the neighborhood. When the police later appeared at our daughter's home to continue the investigation, it was apparent that they took the matter very seriously.   Later the police contacted us again, and told us that a physical examination of SM had revealed the presence of a notch in her hymen, suggesting that she may have been sexually abused.   At the request of police, I submitted to a polygraph examination, wherein I naturally denied abusing SM.   My wife also took a polygraph for the police.   After my wife's examination, the police stopped and interrogated me yet again.   It was during this interrogation that I falsely admitted abusing SM.   I did so because it appeared that the police were determined to arrest someone, and because I feared that JM might have abused SM -- I didn't want JM to get in trouble. Of course, I soon realized the foolishness of my lie, and again asserted my innocence. At the time, however, I was most concerned with JM.

Petitioner also submitted a copy of a 2007 article from the Journal of Pediatric Adolescent Gynecology, which he argues suggests that the hymenal notch described at trial could be a naturally occurring phenomenon and that whether such notches are indicative of sexual abuse may turn on their depth.

In further support of his actual innocence argument, Petitioner seeks leave to depose the victim.   While he concedes there was evidence at his trial that she denied any abuse occurred, he argues a denial now would be substantially more reliable because she is now nearly fifteen years old, and resides with her adoptive family instead of her biological mother.

Petitioner also seeks records pertaining to the victim's evaluation at ABC House, and her brother's evaluations by other social service agencies.  Petitioner theorizes these records will establish that the victim's brother sexually abused her.

Even if Petitioner obtained the information he seeks in his discovery requests, however, the Court concludes he cannot provide affirmative evidence of factual innocence of the crimes of which he was convicted as required by *Herrera*.  The Court must view the fact that the victim continues to deny the abuse occurred and that Petitioner wishes to investigate whether the victim's brother may have sexually abused her in light of the entire record, including Petitioner's confession and other corroborating evidence considered by the trial court in convicting Petitioner in the first instance.

In addition, the Court notes the "evidence" provided in the medical journal article submitted by Petitioner does not directly refute the examining doctors' conclusion that the physical condition of the victim's hymen was highly suggestive of sexual abuse.  While the article notes some hymenal notches *may* be naturally occurring, it does not preclude a diagnosis of sexual abuse based upon the existence of a notch, particularly a very deep notch.  Here, Doctor Chervenak provided detailed testimony not only as to the depth of the hymenal notch, but the abnormal narrowness of the sides of the victim's hymen.  Based upon her

16 - OPINION AND ORDER -

experience in conducting some 700 physical examinations and reviewing reports of some 200-300 additional examinations, she concluded the physical condition of the victim's hymen supported a diagnosis of a blunt penetrating injury. The trial judge, as the trier of fact, was entitled to accept that opinion as persuasive.

Even with the benefit of the new "evidence" to which Petitioner refers, he does not offer any basis to overcome the trial judge's findings of guilt based upon Petitioner's confession and the corroborating evidence presented at trial. Under Or. Rev. Stat. 136.425(1):

> A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats; *nor is a confession only sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed.* (Emphasis added).

The statute codifies one of two formulations of the common-law rule, which requires "independent proof of the *corpus delecti* -- that is, the corroborating evidence must tend to prove the commission of the crime." *State v. Fry*, 180 Or. App. 237, 242 (2002) (citing *State v. Lerch*, 296 Or. 377, 393 (1984)). Under this formulation, "the prosecution must introduce evidence, independent of the confession, that tends to prove that the alleged injury or harm occurred and that the injury or harm was caused by someone's criminal activity." *Lerch*, 296 Or. at 393

17 - OPINION AND ORDER -

(quoting *McCormick on Evidence*, § 158 (2nd ed. 1972)).   Stated differently,

> That the alleged injury or harm occurred and that it was caused by someone's criminal activity are the necessary elements of the corpus delecti for that purpose.   It is not necessary, in order to establish the *corpus delecti* for the purpose of corroborating a confession, to connect the defendant with the crime.

*Fry*, 180 Or. App. at 242 n.5 (citing *Lerch* and McCormick).

Moreover, the corroborating evidence may be circumstantial, and it does not need to be sufficient in itself to establish the *corpus delecti*.   In *Lerch*, the court concluded that "some proof" means "that there is enough evidence from which the jury may draw an inference that tends to establish or prove that a crime has been committed." *Lerch*, 296 Or. at 398 (footnote omitted).

The trial judge, who had the benefit of live witness testimony, found the state presented sufficient corroborating evidence at Petitioner's trial to support a conviction based upon his confession.   The Oregon Court of Appeals affirmed this decision when Petitioner raised it on direct appeal, and the Oregon Supreme Court denied review.   "A state court has the last word on the interpretation of state law." *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002).   This Court finds no Supreme Court authority to show the Oregon courts' interpretation of the state's corroboration requirements violated the Constitution, laws, or treaties of the United States.   As such, that

interpretation will not be re-examined.  *See Pelkey v. Hall*, 2008 WL 3992620 *4 (D. Or. 2008) (declining to re-interpret state court interpretation of corroborating evidence statute).

In light of his confession and the corroborating evidence relied upon by the trial judge to convict him, Petitioner cannot meet the extremely high burden of establishing a freestanding claim of actual innocence in these circumstances.  As such, the Court finds his attempt to amend the Petition to include such a claim is futile and the Motion for Leave to Amend to assert a claim of actual innocence must be denied.

## II.  Motion for Discovery

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course.  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).  Rule 6 of the Rules Governing Section 2254 Cases allows petitioners to conduct discovery "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."  *Id.*

Good cause for discovery exists when there is "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief."  *See Bracy*, 520 U.S. at 908-09 (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)).  A federal habeas petitioner's request for discovery

must be supported by specific factual allegations, and discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999).

As noted, the Court finds Petitioner's request to amend his Petition to allege a freestanding claim of actual innocence would be futile. As such, Petitioner cannot show good cause to conduct discovery. Accordingly, Petitioner's Motion for Leave to Conduct Discovery is DENIED.

**CONCLUSION**

For the reasons set forth above, the Court **DENIES IN PART** and **GRANTS IN PART** Petitioner's Motion for Leave to File Amended Petition (#38).   The Court **GRANTS** the Motion to the extent that Petitioner shall be allowed to file an Amended Petition for Writ of Habeas Corpus alleging only the claim set forth in Ground One of his proposed Amended Petition, and this action shall proceed on that claim.   The Court **DENIES** the motion with respect to the claim set forth in Ground Two of the proposed Amended Petition.

/ / /

/ / /

/ / /

/ / /

/ / /

20 - OPINION AND ORDER -

Further, the Court **DENIES** Petitioner's Motion for Leave to Conduct Discovery (#43).

IT IS SO ORDERED.

DATED this _28_ day of September, 2009.

ANNA J. BROWN
United States District Judge